**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

GINGER MARTINEZ, individually      )
and as Personal Representative of the )
Estate of Kenneth Wayne Ginn,      )
                                   )
        Plaintiffs,                )
                                   )
-vs-                               )        Case No. CIV-07-132-F
                                   )
DeWAYNE BEGGS, as Sheriff of       )
Cleveland County, et al.,          )
                                   )
        Defendants.                )

## ORDER

Before the court is Defendants' Motion for Summary Judgment, filed November 1, 2007 (doc. no. 49). Plaintiffs have responded and defendants have thereto replied. Upon due consideration of the parties' submissions and the relevant law, the court makes its determination.

Background

Kenneth Wayne Ginn died in the Cleveland County Detention Center on May 2, 2006, within hours after being arrested for public intoxication. Ginger Martinez, Mr. Ginn's daughter, brings this 42 U.S.C. § 1983 action individually and as personal representative of the estate of Mr. Ginn, alleging that defendants, DeWayne Beggs, Kevin Brandon, David Epps, Tommy Edwards and Gilbert Kirkland, in their individual and official capacities, violated Mr. Ginn's constitutional rights under the Fourteenth Amendment.[1] Specifically, plaintiffs allege that each of the defendants

---

[1] In the Second Amended Complaint filed on August 7, 2007, plaintiffs include as defendants, Jeffrey Jones, Charles L. Carter and James Bullard. Plaintiffs' claims against these defendants, however, have been previously dismissed without prejudice pursuant to stipulations of dismissal.

demonstrated deliberate indifference to Mr. Ginn's serious medical needs. Plaintiffs also allege state law claims of negligence against defendant, Board of County Commissioners of Cleveland County. Defendants seek summary judgment on plaintiffs' claims.

Standard of Review

Under Rule 56(c), Fed. R. Civ. P., summary judgment shall be granted if the record shows that, "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The moving party has the burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In determining whether a genuine issue of a material fact exists, the evidence is to be taken in the light most favorable to the non-moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials, demonstrating that there is a genuine issue for trial. Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir. 1983).

Relevant Facts

Viewed in a light most favorable to plaintiffs, as the non-moving parties, the relevant facts are as follows. At approximately 5:16 p.m. on May 2, 2006, defendant, Tommy Edwards ("Edwards"), a field deputy with the Cleveland County Sheriff's Office ("CCSO"), was dispatched to a fight in progress call at a house in Noble, Oklahoma. The dispatcher advised Edwards that the caller was an eleven year old boy and that the details of the fight were unclear. Edwards arrived at the scene at approximately 5:28 p.m. Defendant, Gilbert Kirkland ("Kirkland"), a reserve deputy

2

with CCSO, responded as backup for Edwards for the call.  Although Kirkland was backup for Edwards, Kirkland actually arrived at the scene at 5:22 p.m.

Upon Kirkland's arrival, he noticed a house with an unfinished porch.  Kirkland observed an adult male, whom he later learned to be Kenneth Wayne Ginn, sitting on the ground in the portion of the unfinished part of the porch.  Mr. Ginn was sitting on the ground between two porch runners,[2] both of which stood approximately two feet above the ground.  Kirkland did not see how Mr. Ginn actually ended up on the ground, but Kirkland approached Mr. Ginn and asked him if he was alright, and Mr. Ginn stated that he was alright.  Kirkland asked Mr. Ginn if he had been drinking and Mr. Ginn stated "Yes."  Mr. Ginn's speech was slurred, his eyes were bloodshot, and Kirkland could smell an odor of alcohol.

Teresa Carlson ("Carlson"), an adult female, opened the door of the house to talk to Kirkland.  She informed Kirkland that Mr. Ginn was a neighbor who visited often, that he had consumed a bottle of whiskey, and that he tried to fight her daughter, whom Kirkland presumed was the young adult female standing nearby.  Carlson told Kirkland that she had asked Mr. Ginn to leave, and that as he was leaving, he fell to the ground inside the unfinished portion of the porch, and she simultaneously motioned toward Mr. Ginn and where he was on the ground.  Carlson told Kirkland that Mr. Ginn appeared to be knocked out for a short time.  She told Kirkland that Mr. Ginn "seemed to be hallucinating and seeing people trying to get him."  Affidavit of Teresa Carlson, ¶ 13.  She told him that she thought he needed to

---

[2]  "Runners" is the term used by defendant Kirkland in his affidavit and by defendants in their brief.  Kirkland aff., ¶ 4; brief at 6.  In context, it appears that this is a reference to exposed floor joists in the unfinished part of the porch.  As relevant here, and viewing the record most favorably to the plaintiff, Mr. Ginn's presence in that position would be reliable evidence from which it could fairly have been inferred by the officers at the scene that Mr. Ginn was intoxicated to the point of not being able to move about without some risk of mishap.

go to the doctor.  Carlson told Kirkland that she did not want to press charges against Mr. Ginn, she just wanted him off her property.

When Edwards arrived at the scene, Kirkland explained the situation.  Edwards approached Mr. Ginn and told him to get up and they would take him home.  Mr. Ginn asked Edwards if he wanted to fight and told Edwards that he would kick Edwards' "ass."  Edwards told Mr. Ginn that he did not want to fight, that he needed to get up and go home.

According to Kirkland's affidavit, he did not observe any injury of any kind on Mr. Ginn, but asked him if he needed any medical assistance and Mr. Ginn stated he did not.  Affidavit of Gilbert Kirkland, ¶ 5.  According to Carlson's affidavit, one of the deputies asked Mr. Ginn if he wanted to go to the hospital and she did not believe that he responded.[3]  She told the deputy he should call the paramedics.  According to Carlson, she was told to "shut up and go inside."  Affidavit of Teresa Carlson, ¶ 16.

Barbara McSwain ("McSwain"), a deputy sheriff with CCSO, had heard the fight call to Edwards and also responded to the call.  She recognized the address for the subject house as one where illegal drug activity had previously occurred.  She also recognized the address as being very near to the residence of Mr. Ginn, a man she had known personally for two years.  She knew that Mr. Ginn was an alcoholic.

McSwain arrived at approximately 5:36 p.m.  Mr. Ginn was still in the same position and location as when Kirkland initially arrived.  Edwards explained the situation.  McSwain told Edwards and Kirkland that she knew Mr. Ginn personally and that he was an alcoholic.  McSwain then attempted to convince Mr. Ginn to go

---

[3]  After Mr. Mr. Ginn's death, the Oklahoma State Bureau of Investigation conducted an investigation.  In the report of the interview of Teresa Carlton on May 12, 2006, it was stated that Kirkland asked "GINN if he wanted to go the emergency room to get checked out, and GINN again declined any medical treatment."  Plaintiff's Exhibit K, p. 20.  The court, however, views the evidence in a light most favorable to plaintiffs.

home or to let one of the deputies take him home.  McSwain could tell from Mr. Ginn's reaction that he recognized her.  He responded, with slurred speech, that he was not going anywhere and that he was going to kick "ass."

According to the affidavit of Carlson's daughter, Misty Fisher, she told the deputies that Mr. Ginn had consumed an "entire large bottle of Crown Royal on the way home from town."  She also told them that he "had been talking as if he was seeing someone."  Plaintiff's Exhibit J, ¶ 17.

Because Carlson had said that she wanted Mr. Ginn off her property, the deputies told Mr. Ginn that if he did not go home, they would arrest him for public intoxication.  He continued to refuse to leave.  Edwards advised Mr. Ginn he was placing Mr. Ginn under arrest for public intoxication.  Edwards told Mr. Ginn to stand up.  When did he did not, Edwards reached down toward Mr. Ginn's arm to assist him up.  Mr. Ginn took a swing at Edwards and said "don't touch me."  Edwards grabbed Mr. Ginn's arm and attempted to pull him up, but he pulled away.  Kirkland grabbed Mr. Ginn's left arm and Edwards grabbed Mr. Ginn's right arm.  Edwards applied an arm bar hold, forcing Mr. Ginn to lean forward.  This allowed Kirkland and Edwards to bring Mr. Ginn's arms behind his back and Edwards placed handcuffs on Mr. Ginn's wrists.  According to Carlson's and Fisher's affidavits, the deputies picked Mr. Ginn up and dragged him to the patrol car.  Affidavit of Teresa Carlson, ¶ 17, Affidavit of Misty Fisher, ¶ 19.  During this time, Mr. Ginn grumbled in a tone of frustration that he should not have been arrested.

At the patrol unit, Kirkland patted Mr. Ginn down and placed him in the back seat of the patrol car.  Edwards asked Mr. Ginn how much he had to drink and he refused to answer.  Edwards asked Mr. Ginn if he had consumed anything other than alcohol and he said that he had not.  Edwards completed the arrest affidavit and gave it to Kirkland. According to the arrest affidavit, Mr. Ginn was "unable to stand, had

slurred speech and smelled of an odor commonly associated with an alcoholic [b]everage."  Exhibit 1 to Plaintiff's Exhibit B.

According to Carlson's affidavit, the three deputies talked for several minutes. She saw Mr. Ginn slumped over in the back seat of the car and she was concerned that he had passed out.  Affidavit of Teresa Carlson, ¶ 18.

Kirkland transported Mr. Ginn to the Cleveland County Detention Center ("CCDC") on the charge of public intoxication.  Kirkland's drive took approximately fifteen to twenty minutes.  As Kirkland drove, Mr. Ginn was awake, sitting upright in the back seat.  Mr. Ginn complained of his handcuffs being too tight.  Mr. Ginn did not appear to be injured and did not ask for any medical assistance.  Kirkland suggested that he lie down in the seat because that might relieve pressure to his wrists. Approximately two or three minutes away from CCDC, Kirkland noticed Mr. Ginn had laid down in the backseat.  Mr. Ginn was not making any noise and Kirkland thought Mr. Ginn had "passed out, like most of your drunks do."  Deposition of Gilbert Kirkland, p. 19, ll. 15-16.        When Kirkland arrived at the CCDC, defendants Kevin Brandon ("Brandon") and David Epps ("Epps"), who were jailers, opened the back door of the patrol car.  Mr. Ginn was leaning partially against the other door.  He was awake.  Brandon felt that if they attempted to take Mr. Ginn out by that door, they would run the risk of him falling and injuring himself.  Brandon and Epps took Mr. Ginn by his feet to pull him to the open door.  Mr. Ginn grumbled in a tone of frustration about being arrested and tried to kick Brandon.  Brandon told Mr. Ginn to calm down.  Mr. Ginn was then cooperative.  Brandon and Epps then pulled Mr. Ginn by his feet far enough to the open door that he could stand up.  Brandon held onto Mr. Ginn's arm with both hands and Epps had Mr. Ginn's other arm.  Kirkland was following behind.  As they were going to the jail, Epps asked Mr. Ginn if he was ok, and he responded "Yeah" in a slurred and grumpy manner.  While going to the

jail, Mr. Ginn stumbled and he dragged his feet once or twice and Brandon and Epps had to assist Mr. Ginn back up on his feet.  According to Brandon, it would take a momentary exertion to get Mr. Ginn back up on his feet and Brandon considered himself at that point to be carrying Mr. Ginn.  Also, according to Brandon, Mr. Ginn was sweating.  Plaintiffs' Exhibit D, p. 16, l. 10.[4]

Based upon Mr. Ginn's appearance, behavior and level of intoxication, Brandon and Epps believed that Mr. Ginn would be unable to answer routine booking questions.  He had responded to questions or directions with a grunt or mumble. According to Kirkland, Mr. Ginn, in answer to questions, "would ignore you or go off on something else completely different."  Plaintiffs' Exhibit A, p. 25, ll. 3 - 4.  So upon entering the CCDC with Mr. Ginn, with Kirkland following, Brandon and Epps took Mr. Ginn down the hallway to receiving cell 102, prior to formally processing him into the CCDC.

There were six receiving cells on the first floor of the CCDC.  Each contained a concrete bench, a toilet and a sink.  Generally, the receiving cell housed detainees on a short-term basis.

It was not uncommon for an intoxicated person to be taken directly to a receiving cell before being formally processed into the CCDC.  This occurred when an intoxicated person was unable, due to his intoxication, to answer routine questions asked during processing, such as personal history, family contact numbers and medical information.  The intoxicated person would be placed in the receiving cell for up to four hours to allow him to sober up enough to answer the routine questions.

---

[4] The court has viewed the DVD exhibit (Exhibit 1 to Defendants' Exhibit E), reflecting Mr. Ginn's arrival at the reception area of the CCDC.  He was obviously intoxicated and needed assistance in walking, but did not need to be carried by Brandon and Epps.

Once Mr. Ginn was placed in receiving cell 102, Brandon and Epps, for safety reasons, put Mr. Ginn on his knees in front of the concrete bench in order to take off the handcuffs.  Mr. Ginn's chest was resting on the bench.  When Brandon and Epps took the handcuffs off, Mr. Ginn put his arms underneath his head, and Brandon, Epps and Kirkland, walked out.  Mr. Ginn did not say anything at that time.

After Kirkland exited receiving cell 102, he completed his paperwork, left the CCDC and returned to his duties in patrolling Cleveland County.

At approximately 9:35 p.m., Brandon conducted a sight check of the receiving cells.  He looked into receiving cell 102 and initially believed Mr. Ginn was sleeping in a kneeling position.  He opened the door to get a verbal response from Mr. Ginn.  Twice, Brandon asked out loud, "Are you okay, sir?" Mr. Ginn did not respond either time, so Brandon approached Mr. Ginn with the intent to nudge him awake.

As Brandon approached Mr. Ginn, he noticed that Mr. Ginn appeared to have a bluish tone on his face.  Brandon immediately called for backup and deputies, Charles Carter ("Carter") and James Bullard ("Bullard") responded.  They checked Mr. Ginn's vital signs.  Mr. Ginn was cold to the touch and the deputies were unable to detect a pulse or breath.  They moved Mr. Ginn from his kneeling position onto the ground and on his back in a prone position so that they could attempt life saving procedures.  Carter and Bullard initiated the automatic defibrillator on Mr. Ginn.  While they did this, Brandon notified dispatch to call for an ambulance.  The defibrillator did not appear to deliver a shock to Mr. Ginn; a defibrillator can only deliver an electric shock if it in fact detects a heart rhythm in the patient.

Brandon contacted Lieutenant Rhonda Peterson and explained the situation.  She instructed him to secure the scene, call for field duties, and start a log, which he did.  Then, Norman Fire Department personnel arrived at the CCDC, followed immediately by Emergency Medical Services personnel.   Brandon met these

responders and escorted them to receiving cell 102.  When they arrived, they observed Mr. Ginn and stated that there was nothing that could be done for him.

From the time Mr. Ginn was brought into the CCDC until he was found unconscious in his cell, Brandon and Epps were the two detention officers roaming the first floor of the CCDC.  One of their job duties that evening included conducting sight checks of all persons housed on the first floor of the CCDC.  Neither Brandon nor Epps specifically recall conducting a sight check on Mr. Ginn, but Brandon believes he saw Mr. Ginn one time before 9:35 p.m.  Brandon states that he looked in the cell and Mr. Ginn appeared to be sleeping.  If a sight check is done, it is supposed to be logged in CCDC's computer.  There was no record in the CCDC computer of any sight checks on Mr. Ginn.

Epps, who would have been responsible for booking Mr. Ginn into CCDC, would have been responsible for conducting a medical screening on Mr. Ginn.  Epps never conducted a medical screening because he did not believe Mr. Ginn was fully capable of cooperating.  Epps made no attempt to do a medical screening in the approximate three hour period before Mr. Ginn was found dead.

Epps and Brandon were not informed by Kirkland that Mr. Ginn had consumed a bottle of whiskey prior to his arrest.  No inquiry was made about how much alcohol had been consumed.  Epps and Brandon did not know Mr. Ginn's blood alcohol level.

Mr. Ginn was not required to submit to an breathalyzer or blood alcohol test because he was arrested for public intoxication.  It was the policy of the CCDC not to offer a person arrested for public intoxication a breathalyzer or blood alcohol test because under Oklahoma law, evidence of the alcohol concentration of a person's breath or blood is not required to arrest or charge that person for public intoxication.

Chai Choi, M.D. conducted the autopsy of Mr. Ginn.  Dr. Choi concluded that Mr. Ginn died of "acute coronary syndrome to occlusive atherosclerotic coronary

artery disease" and that "[a]cute ethanol intoxication would be a contributory factor to his death." Defendant's Exhibit I. Dr. Choi also stated in the report that Mr. Ginn's blood alcohol level was .32%. She did not have an opinion as to whether he would have experienced the same heart attack without acute ethanol intoxication. Defendant's Exhibit H, Answer No. 5.

DeWayne Beggs ("Beggs"), Sheriff of Cleveland County, was not present at Mr. Ginn's arrest or when he was placed in the receiving cell at the CCDC. Beggs testified that he was aware that people can die from drinking too much alcohol. He also testified that individuals were often arrested for public intoxication. He was unaware of any specific training regarding alcohol toxicity, other than breathalyzer training, that was provided to any of his deputies. He also testified that he did not provide or require any training regarding how to determine whether an individual who has an excessive amount of alcohol needs medical supervision. According to Beggs, a deputy was not authorized to perform a breathalyzer test for an individual who was arrested for public intoxication because Oklahoma law did not require that test for the prosecution of public intoxication cases. Beggs testified that breathalyzer tests were never administered to individuals arrested for public intoxication. Plaintiff's Exhibit G, p. 10, l. 6; p. 23, l. 15.

The manual for CCDC provides in pertinent part as follows:

> Any inmate who is charged with being under the influence of alcohol or drugs or who has alcohol on his breath at the time of booking should be considered as a possible alcoholic. Inmates requiring detoxification or booked on drug charges will be placed in a holding cell for 4 to 6 hours or until sober and observed a minimum of every 30 minutes.

* * * *

> The booking deputy will ask the arresting officer about blood alcohol level of the inmate which would mean referral elsewhere based on a high blood alcohol level. If the blood alcohol level is .30 or more the inmate will not be accepted. If the inmate is unconscious, he will not be accepted.

> If an inmate is booked into the facility under borderline conditions the Shift Supervisor will ensure that the inmate is checked at least every fifteen minutes.

Plaintiff's Exhibit L, at p. 3.

Beggs testified that the portion of the policy requiring the booking deputy to ask the arresting officer about the blood alcohol level of the inmate applied only to DUI. Beggs also testified that if Mr. Ginn had been arrested for DUI with a blood alcohol level of .32, he would not have been admitted into the CCDC.

In the opinion of plaintiffs' expert, Dr. Kenneth B. Desser, Mr. Ginn died as a result of severe ischemic heart disease, compounded by a toxic alcohol level and ventricular hypertrophy. Dr. Desser also opined that if Mr. Ginn had been transported to a medical facility, Mr. Ginn's blood alcohol level would have been measured exceeding 300 mg/dl and that the following would have occurred: Mr. Ginn would have been kept for observation; would have experienced an acute coronary syndrome and ventricular arrhythmia; the arrhythmia would have been successfully reversed; and after successful treatment, Mr. Ginn would have undergone cardiac catheterization and coronary angiography which would have resulted in either coronary bypass surgery or percutaneous coronary intervention. Dr. Desser further opines that Mr. Ginn's death was preventable. Plaintiff's Exhibit O, at p. 3.[5]

---

[5]   Dr. Desser's expert opinions are subject to a pending motion to exclude based upon Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), which the court does not address in this order.

Discussion

I.    Individual Capacity Claims

Plaintiffs allege that defendants violated Mr. Ginn's constitutional rights by acting with deliberate indifference to Mr. Ginn's serious medical needs.  Defendants contend that their actions did not amount to a violation of Mr. Ginn's constitutional rights.  They argue that they are entitled to qualified immunity as to plaintiffs' claims.

The doctrine of qualified immunity shields government officials from liability based on their discretionary acts.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The doctrine thus gives government officials the freedom to perform their official duties without fear that even a slight misstep will trigger their financial ruin. Hollenbaugh v. Maurer, 397 F.Supp.2d 894, 902 (N.D. Ohio 2005) (citing Wyatt v. Cole, 504 U.S. 158, 167 (1992)).  Nevertheless, government officials lose qualified immunity when they "violate clearly established statutory of  constitutional rights of which a reasonable person would have known."  Harlow, 457 U.S. at 818.

The Tenth Circuit has established a two-part inquiry for evaluation of claims of qualified immunity in the summary judgment context:

> First, the plaintiff must establish the defendant violated a constitutional right.  If no constitutional violation is established by the plaintiff's allegations or the record, our inquiry ends.  But if a constitutional right was violated, we next ask if the constitutional right was clearly established. To be clearly established, either Supreme Court or Tenth Circuit precedent must be on point or the clearly established weight of authority from other courts must agree with plaintiff's contention.

Estate of Larsen ex rel Sturdivan v. Murr, ___ F.3d ___, 2008 WL 40020 *2 (10th Cir. Jan. 2, 2008) (citing Cortez v. McCauley, 478 F.3d 1108, 1114-1115 (10th Cir.2007)). Consequently, in analyzing plaintiffs' § 1983 claims, the court must decide whether

plaintiffs have proffered sufficient evidence of a constitutional violation.  If so, the court must decide whether the violation was clearly established.          "Under the Fourteenth Amendment's due process clause, pretrial detainees, like [Mr. Ginn], are entitled to the same degree of protection regarding medical attention as that afforded convicted inmates under the Eighth Amendment."  Frohmader v. Wayne, 958 F.2d 1024, 1028 (10th Cir. 1992).  This is because "[a]n individual incarcerated, whether for a term of life for the commission of some heinous crime, or merely for the night to 'dry out' in the local drunk tank, becomes both vulnerable *and* dependent upon the state to provide certain simple and basic human needs."  Fitzke v. Shappell, 468 F.2d 1072, 1076 (6th Cir. 1972) (emphasis in original).  Thus, plaintiffs' claim must be judged against the "deliberate indifference to serious medical needs" test of Estelle v. Gamble, 429  U.S. 97, 104 (1976).  But because "society does not expect that prisoners will have unqualified access to health care," Hudson v. McMillian, 503 U.S. 1, 9 (1992), it must be borne in mind that "deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.' " Id. (citing Estelle).

"Deliberate indifference" involves both an objective and a subjective component.  Olsen v. Layton Hills Mall, 312 F.3d 1304, 1315 (10th Cir. 2002).  The objective component is met if the deprivation is "sufficiently serious."  Sealock v. Colorado, 218 F.3d 1205, 1209 (10th Cir. 2000).  A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Mata v. Saiz, 427 F.3d 745, 751 (10th Cir. 2005).  A medical need can be sufficiently serious based either on the ultimate harm or "the symptoms presented at the time the [arresting or jail officer] has contact with the [detainee]." Mata v. Saiz, 427 F.3d at 753.  The subjective component is met if an arresting or jail

officer "knows of and disregards an excessive risk to [a detainee's] health or safety." Farmers v. Brennan, 511 U.S. 825, 837 (1994). Essentially, the arresting or jail officer must be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Olsen, 312 F.3d at 1315 (quotations omitted). An arresting or jail officer's knowledge of a substantial risk may be inferred from circumstantial evidence. Farmers, 511 U.S. at 842. A fact finder may conclude that an arresting or jail officer knew of a substantial risk "from the very fact that the risk was obvious." Id.

A.    Arresting Officers - Edwards and Kirkland

Viewing the facts and evidence in a light most favorable to plaintiffs, the court concludes that plaintiff have failed to proffer sufficient evidence to create a genuine issue of material fact as to the objective component of deliberate indifference based upon Mr. Ginn's symptoms or condition at the time of his arrest and transport to CCDC. Mr. Ginn's condition was not diagnosed by a physician as mandating treatment. As to Edwards, the record, read favorably to the plaintiff, shows that he knew Mr. Ginn had reportedly consumed an entire bottle of whiskey but also knew Mr. Ginn was an alcoholic; he knew that Mr. Ginn had fallen to the ground through the unfinished portion of the front porch, that he might have hit his head, "that he appeared to be knocked out for a short time," Plaintiff's Exhibit C, ¶ 13, and that he "had been talking as if he was seeing someone," Plaintiff's Exhibit J, ¶ 17, had slurred speech, was unable to stand and could not walk on his own to the patrol car. Kirkland knew Mr. Ginn had consumed an entire bottle of whiskey but also knew Mr. Ginn was an alcoholic, he knew that Mr. Ginn had fallen to the ground through the unfinished portion of the front porch, may have hit his head and appeared to have been knocked out for a short time, he thought Mr. Ginn "had passed out" in the patrol car shortly before arriving at CCDC, he knew Mr. Ginn was unable to walk into the

CCDC without assistance, had bloodshot eyes, had slurred speech, and in response to a question "would ignore you or go off on something else completely different." Plaintiffs' Exhibit A, p. 25, ll. 3 - 4. However, during Edwards and Kirkland's encounter with Mr. Ginn, he was conscious and exhibited no signs of pain or distress. He never verbalized that he was sick. While Kirkland thought Mr. Ginn had passed out on the way to CCDC, Mr. Ginn was awake when he entered CCDC and when Kirkland left Mr. Ginn's cell. Although plaintiffs have proffered Carlson's affidavit wherein she testifies that she does not believe Mr. Ginn answered when one of the deputies asked him if he wanted to go to the hospital, plaintiffs do not dispute Kirkland's affidavit testimony that Mr. Ginn, when initially encountered by Kirkland, told Kirkland that he was alright. Mr. Ginn exhibited no external injuries.[6] He was not vomiting, choking or having any trouble breathing. There is no evidence of agitation or nervousness. Mr. Ginn was aware that he was being arrested. There is no evidence that from these defendants' perspective, Mr. Ginn acted differently from other persons defendants encountered or arrested in an intoxicated state. While the medical examiner found Mr. Ginn's alcohol blood level to be .32, it is undisputed that defendants were not aware of Mr. Ginn's blood alcohol level at the time of arrest and transport to CCDC. Under Oklahoma law, law enforcement agencies are not required to administer blood and breath tests, even at a defendant's request, prior to arresting a defendant for public intoxication. Findlay v. City of Tulsa, 561 P.2d 980 (Okl. Cr. 1977). Moreover, the circumstances of Mr. Ginn's arrest did not fulfil the conditions

---

[6] In their affidavits, Carlson and Fisher testify that while trying to handcuff Mr. Ginn, one of the deputies slammed Mr. Ginn's head on the porch hard enough for Mr. Ginn's head to bleed. The medical examiner's report, although revealing contusions, marks, scars and abrasions on Mr. Ginn's body, makes no reference to any contusion, mark, scar or abrasion on his head. Plaintiffs' Exhibit I. The court, even viewing the evidence in a light most favorable to plaintiffs, can only conclude that the wound to Mr. Ginn was superficial. The court further notes that plaintiffs have not alleged an excessive force claim in this action.

for applying Oklahoma's implied consent statute. *See*, 47 O.S. 2001, § 751. The court concludes that the facts presented are not sufficient for a reasonable jury to conclude that Mr. Ginn's symptoms or condition, at the time of arrest and transport to the CCDC, were "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Mata, 427 F.3d at 753. The court therefore concludes that plaintiffs have not satisfied the objective component of the deliberate indifference test based upon Mr. Ginn's symptoms or condition at the time of his arrest and transport to CCDC.

In addition to Mr. Ginn's intoxicated condition, plaintiffs rely upon the ultimate harm to Mr. Ginn, that is, his heart attack and death, to support their deliberate indifference to serious medical need claim. The court concludes that the ultimate harm to Mr. Ginn, that is, his heart attack and death, were, without doubt, sufficiently serious to meet the objective component. *See*, Mata, 427 F.3d at 745 (heart attack sufficiently serious to satisfy the objective prong). The court therefore turns to the subjective component of the deliberate indifference test.

Viewing the facts and evidence in a light most favorable to plaintiffs, the court concludes that the record is insufficient to raise a genuine issue of material fact as to whether defendants Edwards and Kirkland knew of and disregarded an excessive risk to Mr. Ginn's health and safety. There is insufficient evidence in the record of facts from which an inference could be drawn that a substantial risk of heart attack and death existed and that defendants drew that inference. Although defendants knew Mr. Ginn was intoxicated, had fallen, may have hit his head and appeared (to persons at the scene when they arrived) to have been knocked out for a short time, was unable to stand and walk without assistance, and Kirkland thought Mr. Ginn "had passed out" in the patrol car shortly before arriving at CCDC and knew that Mr. Ginn was unable to walk into the CCDC without assistance, and in response to a question "would

16

ignore you or go off on something else completely different," the court concludes that this evidence does not raise a genuine issue of material fact that defendants knew that a substantial risk of serious harm existed. As stated, defendants did not know Mr. Ginn's blood alcohol level. There was no Oklahoma statutory or case authority permitting or requiring a breath or blood test to be administered to Mr. Ginn, as a public intoxication arrestee. In addition, there is no evidence in the record of any symptoms or signs indicating that Mr. Ginn would suffer from a heart attack. Again, there is no evidence in the record that Mr. Ginn was in any pain or distress. During defendants' encounter with Mr. Ginn, he was conscious and understood he was being arrested. There is no evidence in the record which would permit a reasonable jury to conclude that a substantial risk of heart attack was obvious. The court concludes that the evidence in the record is insufficient to show that defendants were aware that Mr. Ginn faced a substantial risk of a heart attack and required medical attention.

Plaintiffs have presented evidence from their expert, Dr. Desser, by way of affidavit, that in his opinion "Mr. Ginn[] should have been transported to a medical facility after he was taken into custody by law enforcement officers." Plaintiffs' Exhibit O, p. 3. In addition, plaintiffs have argued that Kirkland should have informed Brandon and Epps of how much alcohol Mr. Ginn had consumed and the fact that Mr. Ginn had fallen, may have been seeing people and may have passed out. However, the court concludes that this evidence is not sufficient to create a genuine issue of material fact as to the subjective component of the deliberate indifference claim. Liability cannot be based on negligence or even gross negligence. Barrie v. Grand County, Utah, 119 F.3d 862, 869 (10th Cir. 1997). Rather, plaintiffs must show that defendants exhibited deliberate indifference to Mr. Ginn's known and serious medical needs. Dr. Desser's affidavit testimony and Kirkland's omissions of details occurring during Mr. Ginn's arrest and transport fail to provide such evidence. The

17

deputies at the scene were dealing with a man who was obviously intoxicated. He was belligerent. He had clearly worn out his welcome at Teresa Carlson's trailer, and she wanted him out of there. Plaintiff's Exhibit C, ¶¶ 2 - 11. The deputies were neither physicians nor social workers; they were not obliged by § 1983 jurisprudence to provide the services that might have been considered to be optimal by practitioners of those professions.

Because plaintiffs have failed to proffer evidence sufficient to raise a genuine issue of material fact as to the subjective component of the deliberate indifference to medical needs claim, the court concludes that plaintiffs have failed to satisfy the first prong of the qualified immunity analysis in the summary judgment context. The court concludes that defendants Edwards and Kirkland are entitled to summary judgment on plaintiffs' § 1983 claim.

B.    Jail Officers - Brandon and Epps

Viewing the facts and evidence in a light most favorable to plaintiffs, the court concludes that plaintiffs have failed to present evidence sufficient to create a genuine issue of material fact on the objective component of deliberate indifference based upon Mr. Ginn's symptoms or condition when he arrived at CCDC. Mr. Ginn's symptoms or condition had not been diagnosed by a physician as mandating treatment. While Mr. Ginn was intoxicated, unable to walk on his own, responded to questions with a grunt or a mumble and was sweating, the court concludes that his condition was not one that a reasonable jury could find was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Mata, 427 F.3d at 753. Although the medical examiner found Mr. Ginn's blood alcohol level to be .32, it is undisputed that defendants did not know Mr. Ginn's blood alcohol level. There is nothing in the record to show that from these defendants' perspective, Mr. Ginn's symptoms or condition distinguished him from alcohol abusers that defendants dealt

18

with on a daily basis. There is no evidence in the record of any complaints from Mr. Ginn of any pain or distress. There were no external injuries. He was not vomiting or choking. When defendants left the cell, Mr. Ginn was conscious. The court concludes that Mr. Ginn's symptoms upon arrival at CCDC were not sufficiently serious to satisfy the objective component of deliberate indifference standard.

Plaintiffs rely upon Mr. Ginn's heart attack and death, in addition to his intoxicated condition, to support their claim. The court concludes that the ultimate harm to Mr. Ginn, that is, his heart attack and death, was, without doubt, sufficiently serious to meet the objective component. *See*, <u>Mata</u>, 427 F.3d at 745 (heart attack sufficiently serious to satisfy the objective prong). Accordingly, the court turns to the subjective component of the deliberate indifference test.

Viewing the facts and evidence in a light most favorable to plaintiffs, the court concludes that the record is insufficient to raise a genuine issue of material fact as to whether defendants Brandon and Epps knew of and disregarded an excessive risk to Mr. Ginn's health and safety. There is insufficient evidence in the record of facts from which an inference could be drawn that a substantial risk of harm existed and that defendants drew that inference. Although defendants knew Mr. Ginn was intoxicated, unable to walk on his own, unable to respond to questions without grunting or mumbling and sweating, the court concludes that this evidence does not raise a genuine issue of material fact that defendants knew that a substantial risk of serious harm existed. As stated, defendants did not know Mr. Ginn's blood alcohol level. They did not know how much alcohol he had consumed. Moreover, there is no evidence in the record of any symptoms or signs Mr. Ginn would suffer a heart attack. Again, there is no evidence in the record that Mr. Ginn was in any pain or distress. During defendants' encounter with Mr. Ginn, he was conscious and at least somewhat responsive. There is no evidence in the record from which a reasonable

jury could conclude that a substantial risk of heart attack was obvious upon Mr. Ginn's arrival at the CCDC.[7]  The court concludes that the evidence in the record is insufficient to show that defendants were aware that Mr. Ginn faced a substantial risk of a heart attack and required medical attention.

In support of the subjective element, plaintiffs point to evidence that defendants, Brandon and Epps, failed to provide Mr. Ginn with a medical screening and failed to monitor him in accordance with the CCDC detention manual.  Although defendants object to the admissibility of this evidence as irrelevant and a potential cause for jury confusion, the court need not decide the admissibility issue for purposes of summary judgment.  The court concludes that even if the evidence were admissible, this evidence is not sufficient to create a genuine issue of material fact as to the subjective component of the claim asserting deliberate indifference to serious medical needs.  The court concludes that defendants' failure to provide Mr. Ginn with a medical screening upon entry into the CCDC[8] and failure to monitor while at the CCDC, under the circumstances of this case, establishes, at most, negligence or gross negligence.  Deliberate indifference is a very high standard, a showing of negligence

---

[7]  In this respect, Judge Tacha's opinion for the Court of Appeals in <u>Hocker v. Walsh</u>, 22 F.3d 995 (10th Cir. 1994) is apposite.  In <u>Hocker</u>, plaintiff's decedent was brought to the jail in an intoxicated condition, and then hung herself in her jail cell.  She was too intoxicated to be processed into the jail when she arrived there, *id.* at 997, and still could not be processed five hours after she arrived, *id.,* but it was not apparent that she was suicidal.  In affirming summary judgment, Judge Tacha wrote for the court that "[t]hough the staff obviously knew that Ms. Hocker was intoxicated or under the influence of drugs, intoxication with its accompanying incoherence does not, by itself, give the Detention Center staff knowledge that Ms. Hocker posed a specific risk of suicide." *Id.* at 1000.  Intoxication, at least in a 49 year-old man like Mr. Ginn, would seem to be even less likely to portend a heart attack. *Compare,* <u>Hutto v. Davis</u>, 972 F.Supp. 1372 (W.D. Okla. 1997) (summary judgment denied where defendants "did nothing while [detainee] lay convulsing on the floor of his jail cell while other inmates repeatedly called for help." *Id.* at 1378).

[8]  The court notes that plaintiffs have not provided any evidence that performance of the medical screening would have revealed that Mr. Ginn had a .32 alcohol blood level or that he was at risk for a serious heart attack.

and even gross negligence will not suffice.  <u>Barrie</u>, 119 F.3d at 869.  The court concludes that this evidence along with the other evidence in the record as to defendants' encounter with Mr. Ginn is insufficient to raise a genuine issue of material fact that defendants knew Mr. Ginn faced a substantial risk of serious harm and needed medical attention.

As plaintiffs have failed to proffer evidence sufficient to raise a genuine issue of material fact as to the subjective component of the deliberate indifference to medical needs claim, the court concludes that plaintiffs have failed to satisfy the first prong of the qualified immunity analysis in the summary judgment context.  The court concludes that defendants Brandon and Epps are entitled to summary judgment on plaintiffs' § 1983 claim.

C.   <u>Sheriff - Beggs</u>

Plaintiffs also bring suit against Sheriff Beggs, in his individual capacity.  In the Second Amended Complaint, plaintiffs do not allege that this defendant was directly involved in the events of Mr. Ginn's arrest and detention.  Instead, they allege that defendant Beggs failed to properly train and supervise Edwards and Kirkland, the arresting officers, and Brandon and Epps, the jail personnel, to ensure that persons in their custody received necessary medical care.

Because plaintiffs are seeking to impose § 1983 liability on defendant Beggs based on inadequate supervision and training, plaintiffs must show both that one or more of his employees acted with deliberate indifference to Mr. Ginn's serious medical needs, and that there is "'an affirmative link between the constitutional violation and the supervisor's own actions, or failure to supervise.'"  <u>Mee v. Ortega</u>, 967 F.2d 423, 431 (10th Cir. 1992) (quoting <u>Meade v. Grubbs</u>, 841 F.2d 1512, 1527 (10th Cir. 1988)).  Here, the court has found insufficient evidence that defendant's subordinates acted with deliberate indifference to Mr. Ginn's serious medical needs

and therefore has found no constitutional violation on the part of defendant's subordinates. Because there was no constitutional violation by the subordinates, there is no constitutional violation which can be affirmatively linked to this defendant's own actions or failure to supervise. The court therefore concludes that plaintiffs cannot succeed on their claim against defendant Beggs, in his individual capacity. *See*, <u>Graves v. Thomas</u>, 450 F.3d 1215, 1225 (10th Cir. 2006); <u>Hinton v. City of Elwood, Kan.</u>, 997 F.2d 774, 783 (10th Cir. 1993). Accordingly, the court concludes that defendant Beggs, in his individual capacity, is entitled to summary judgment on plaintiffs' § 1983 claim.

II.    <u>Official Capacity Claims</u>

Plaintiffs also allege a failure to train claim against defendants, DeWayne Beggs, Tommy Edwards, Gilbert Kirkland, Kevin Brandon and David Epps, in their official capacities. Plaintiffs' claims against defendants are the equivalent of a claim against Cleveland County. <u>Lopez v. LeMaster</u>, 172 F.3d 756, 762 (10th Cir. 1999). Having concluded that Mr. Ginn's constitutional rights were not violated, the claim against Cleveland County likewise fails. The Tenth Circuit has concluded that even if the municipality's policies, training, and supervision are unconstitutional, the municipality cannot be held liable under § 1983 in the absence of a constitutional violation by any of its officers. <u>Trigalet v. City of Tulsa</u>, 239 F.3d 1150, 1155-1156 (10th Cir.), *cert denied*, 534 U.S. 84 (2001); *see also*, <u>Estate of Larsen ex rel. Sturdivan v. Murr</u>, ___ F.3d ___, 2008 WL 40020, *6 (10th Cir. Jan. 2, 2008) (plaintiff cannot proceed on failure to train or supervise claim in an excessive force case since no constitutional violation occurred). Therefore, the court concludes that defendants

Beggs, Edwards, Kirkland, Brandon and Epps, in their official capacities, are entitled to summary judgment as to plaintiffs' § 1983 claims.[9]

III.   State Law Claims

Plaintiffs assert negligence claims against defendant, Board of County Commissioners of Cleveland County, based upon the failure of defendants Edwards and Kirkland to take Mr. Ginn to the hospital instead of to the CCDC, and defendant Beggs' alleged failure to properly manage and supervise defendants Edwards and Kirkland.  Having concluded that summary judgment is appropriate on all § 1983 claims alleged by plaintiffs, the court must determine whether to exercise supplemental jurisdiction over plaintiffs' state law claims of negligence.  Judicial economy, fairness, convenience and comity are all considerations that are to guide a district court's decision whether to defer to a state court rather than retaining and disposing of state law claims.  United Mine Workers v. Gibbs, 383 U.S. 715, 726-727 (1966).  However, the Tenth Circuit has held that when federal claims are resolved before trial, the district court should usually decline to exercise jurisdiction over the state law claims and allow the plaintiff to pursue them in state court.  *See*, Smith v. City of Enid By and Through Enid City Com'n, 149 F.3d 1151, 1156 (10th Cir. 1998); Ball v. Renner, 54 F.3d 664, 669 (10th Cir. 1995).  Having disposed of the federal law claims prior to trial and finding no consideration requiring the court to retain and

---

[9]  In their briefing, plaintiffs, citing to Garcia v. Salt Lake County, 768 F.2d 303 (10th Cir. 1985) and cases from other jurisdictions citing Garcia, contend that defendant Beggs, in his official capacity, may be held liable even though the individual defendants are not held liable.  In Garcia, the Tenth Circuit concluded that "[a]lthough the acts or omissions of no one employee may violate an individual's constitutional rights, the combined act or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights." *Id.* at 310.  The court, however, finds Garcia as well as the other cases cited, to be distinguishable from this case.  Moreover, the court concludes that plaintiffs have not raised a genuine issue of material fact that the combined acts or omissions of Kirkland, Edwards, Brandon and Epps, acting pursuant to the county's policy or custom, violated Mr. Ginn's constitutional rights.

dispose of plaintiffs' state law claims, the court, in its discretion and pursuant to 28 U.S.C. §1367(c)(3), declines to exercise supplemental jurisdiction over plaintiffs' state law claims.  The court shall thus dismiss the state law claims without prejudice.

<u>Conclusion</u>

Based upon the foregoing, Defendants' Motion for Summary Judgment, filed November 1, 2007 (doc. no. 48 ) is **GRANTED** to the extent that defendants seek summary judgment on plaintiffs' 42 U.S.C. § 1983 claims.  As to the remaining state law claims, the court, in its discretion and pursuant to 28 U.S.C. § 1367(c)(3), declines to exercise supplemental jurisdiction over the state law claims and **DISMISSES WITHOUT PREJUDICE** the state law claims.  Judgment shall be entered forthwith.

DATED January 24, 2008.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

07-0132p012(pub).wpd